### PICARD et al. v. SMITH.
### No. 4944.

Court of Appeals of District of Columbia.
Argued March 6, 1930.
Decided April 7, 1930.

Morris Simon, Lawrence Koenigsberger, Eugene Young, and Selig Brez, all of Washington, D. C., for appellants.

S. T. Ansell and E. S. Bailey, both of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

ROBB, Associate Justice.

Appeal from a judgment in the Supreme Court of the District for the plaintiff in the sum of $10,000 upon the verdict of a jury in an action of tort.

The declaration alleges that it was the duty of the defendants as proprietors of Harvey's Restaurant in the District of Columbia "to serve plaintiff's intestate with wholesome food, fit for human consumption, * * * but in violation thereof, the defendants by their servant, servants, employees, and agents, carelessly, negligently, wrongfully, and unlawfully served to the plaintiff's intestate tainted, corrupt, poisonous and unwholesome oysters, unfit for human consumption, which the defendants, their servant, servants, agents, or employees knew or by the exercise of ordinary care and prudence should have known were tainted, corrupt, poisonous, unwholesome, and unfit for human consumption, and that the plaintiff's intestate ate the said oysters so served to him, * * * " and that his death was caused thereby on the 29th of April, 1926.

At the close of plaintiff's evidence, defendants moved for a directed verdict. The motion was overruled. Defendants thereupon introduced evidence.

At the close of all the evidence, defendants again interposed a motion to dismiss, on two grounds: First, "that there was no evidence that the plaintiff's intestate came to his death as the result of eating any oysters furnished by the defendants," and, second, "that there was no evidence tending to show that the defendants were guilty of any negligence." The action of the court in overruling this motion is here assigned as error.

■ By introducing evidence after the denial, at the close of plaintiff's case, of their motion for a directed verdict, the defendants waived their exception. Washington Utilities Co. v. Wadley, 44 App. D. C. 176; McCabe & Steen Co. v. Wilson, 209 U. S. 275, 28 S. Ct. 558, 52 L. Ed. 788. If, therefore, on all the evidence, the jury was justified in finding that plaintiff's intestate came to his death through defendants' negligence as alleged, the second motion was properly overruled.

■ It is the duty of the proprietor of a public restaurant to furnish food fit for human consumption, and failure in this respect resulting in injury is foundation for an action for negligence. King v. Davis, 54 App. D. C. 239, 296 F. 986; Horn & Hardart Baking Co. v. Lieber (C. C. A.) 25 F.(2d) 449; Ash v. Childs Dining Hall Co., 231 Mass. 86, 120 N. E. 396, 4 A. L. R. 1556; Bishop v. Weber, 139 Mass. 411, 1 N. E. 154, 52 Am. Rep. 715; Bark v. Dixson, 115 Minn. 172, 131 N. W. 1078, Ann. Cas. 1912D, 775.

■ Plaintiff's evidence was, in substance, as follows: About 1 o'clock on April 29, 1926, plaintiff's intestate, Kenneth M. Smith, a commissioned officer of the Navy (a chief pharmacist), and five other commissioned officers, all apparently in good health, went to Harvey's Restaurant and ordered oysters. Three of the men had raw oysters on the half shell, and three (Officers Legg, Berkstresser, and Smith) had fried oysters. We will here quote from Officer Berkstresser's testimony: "There were six oysters in each order of fried oysters. I eat very rapidly, and had eaten about five of my oysters when I became nauseated and I excused myself from the rest of the party without telling them that I was ill and went to the toilet, where I remained about five minutes and vomited freely. I returned to the table and noticed that Mr. Smith had quit eating his order of oysters, of which he had eaten about half, and was toying with the rest of the food as if he had lost his appetite; I asked him whether he felt ill in any way and he said he did, and Mr. Legg spoke up and said he also felt ill. We had also ordered coffee and pie. The coffee had been served but the pie had not, and we left the restaurant

without waiting for it, and went across the street, to the Raleigh Hotel at the corner. On the way over Mr. Smith, who was a medical man, suggested that one of the members who was not ill stop in a drug store and get some Seidlitz powders and meet us in our room. The six officers went upstairs and Mr. Smith, Mr. Legg and I took turns vomiting in the bath room. * * * The other officer with the Seidlitz powders came in and we each took one. Before the officer with the Seidlitz powders arrived, one of our party called up the Restaurant and told them the food we had had made us ill, in order that they would not serve it to other patrons."

The hotel physician was called, who prescribed for the three officers who had eaten the fried oysters. Officer Berkstresser, who had vomited immediately and more freely than the others, was not so ill as the other two. The doctor again called early in the evening, and Officers Legg and Smith were apparently better, but about 9 o'clock Berkstresser noticed that Smith was in distress; whereupon he again called the doctor, but before the doctor could arrive Smith was dead; his death occurring about 9 o'clock.

The hotel physician, Dr. Charles W. Hyde, in response to a hypothetical question based upon his own evidence and that of other witnesses for the plaintiff, testified "that Mr. Smith died from the effects of eating contaminated food, oysters, at his noon-day lunch." On cross-examination this witness stated, "My conclusion that these oysters caused the sickness is based on the whole affair, the whole diet, the action of the officers before they went to the restaurant and the condition in which they were a short time after they partook of the oysters it is my impression that all sea food is easily contaminated."

Dr. Rogers, deputy coroner for the District (who performed the autopsy on Mr. Smith), in answer to a hypothetical question, expressed the opinion that death was caused by infected oysters.

Dr. Montgomery A. Stewart, a Commander in the Medical Corps of the United States Navy, with 22 years' experience, testified that it was part of his duty to inform himself and the Naval Service with respect to the preservation of foods, and that he gave special consideration and study to the subject of food poisonings. He was asked the following question: "An oyster eaten at 1:30, and the person who ate it died of having eaten it at 9:30, would you say that the amount of poison put within the system by eating those oysters was a very large one, unusual to be found in oysters?" His answer was, "Yes," and that, "I would say that an oyster eaten at 1:30 and producing death by food poisoning at 9 or 9:30, had not received proper care and treatment."

The evidence for the defendants, here material, is as follows: On the morning of April 28, 1926, the steward of Harvey's Restaurant purchased two gallon cans of oysters. One can he put in cracked ice in a "downstairs" or basement refrigerator. This refrigerator was equipped with a thermometer. The second can of oysters was sent to the kitchen the same morning and put in the kitchen refrigerator, "which is very large and which you could walk in." This refrigerator was not equipped with a thermometer and was not as cold as the one downstairs, nor was the second can of oysters packed in cracked ice. In this kitchen, which was about 40 feet by 25 feet, there was a range along one side about 35 feet long. The ice box was about 6 or 7 feet from the range, and the serving table was nearer the range. As it was the last of April, the weather was getting warm. Oysters were taken from this can during the day of April 28th; the process being to remove the can from the refrigerator, put it on the serving table, take out oysters for the particular order, then replace the can in the refrigerator. Just how many times it was taken out during the day of April 28th does not appear, but it does appear that by lunch time of the 29th not enough oysters remained in this can to fill three orders. When the officers gave their orders for fried oysters, the chef examined the remaining oysters in this can and concluded that they were in good condition. Thereupon he used them, but sent for the other can and finished filling the orders from that can. After notice that the officers had been made ill the contents of the "downstairs" can was examined and found to be wholesome.

In our view there was ample evidence before the jury to justify a finding that Officer Smith came to his death from eating oysters, and that the defendants were negligent. Three men, apparently in good health, were made immediately and very seriously ill by eating a small number of oysters. This fact alone, according to the evidence for the plaintiff, indicated that the oysters were in very bad condition and that they "had not received proper care and treatment." This condition was emphasized by evidence for the defendant to which we have referred,

which disclosed that the contents of the can which had been packed in cracked ice was wholesome. The jury, therefore, was justified in finding that the contents of the can which was kept in the kitchen refrigerator caused the trouble. The weather was warm, and with a range 35 feet long the temperature in the kitchen must have been very high. The large kitchen refrigerator was in general use, and, as the evidence shows, was frequently opened. Every time an order came for oysters, the can was removed from the refrigerator, placed on the serving table, and the order or orders taken out. Just how long the can was out of the refrigerator on each occasion does not appear, but from the evidence the jury were warranted in finding that the contents were affected by the heat of the room, and that the defendants should have known that they were not fit to serve at lunch time on the 29th, having been upstairs in the kitchen refrigerator and in the hot kitchen, according to the defendants' evidence, more than 24 hours.

Other assignments of error, alluded to in the briefs but not in oral argument, have been considered and found without merit.

The judgment is therefore affirmed, with costs.

Affirmed.